**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

BLOCK 60 HOLDINGS LLC,

              Plaintiff,

-vs-                                 Case No.  3:13-cv-1397-J-34PDB

SOUTHERN-OWNERS INSURANCE
COMPANY,

              Defendant.
_____/

## O R D E R

**THIS CAUSE** is before the Court on Defendant Southern-Owners Insurance Company's Motion to Strike Plaintiff's Expert Witness [sic] Arthur C. Baker and James William Funderburk Pursuant to the Federal Rules of Evidence and Incorporated Memorandum of Law (Doc. No. 34; Motion) filed August 29, 2014.  In response to the Motion, on September 29, 2014, Plaintiff filed Plaintiff's Response in Opposition to Defendant's Motion to Strike Plaintiff's Expert Witness Arthur C. Baker and James William Funderburk Pursuant to the Federal Rules of Evidence and Incorporated Memorandum of Law (Doc. No. 38; Response).  With leave of Court, Defendant filed a reply on October 28, 2014.  <u>See</u> Defendant[] Southern-Owners Insurance's Amended Reply to Plaintiff's Response [Doc. [No.] 38] (Doc. No. 44; Reply).  The Motion is ripe for the Court's consideration.

In this action, Plaintiff Block 60 Holdings LLC (Block 60) seeks coverage under an insurance policy issued by Defendant Southern-Owners Insurance Company for a sinkhole

loss alleged to have occurred at its property located at 211 Howard Street East, Live Oak, FL (the Property) in August 2007.  See generally Third Amended Complaint (Doc. No. 21; Complaint).   Specifically, Block 60 asserts a breach of contract claim based on its allegations that Southern-Owners failed to "conduct a statutorily compliant subsidence investigation to determine the cause of the reported loss, or to investigate the presence or absence of sinkhole activity" as required by the insurance contract issued by Southern-Owners to Block 60.  Id. ¶¶27-32, 38.  Block 60 further alleges that Southern-Owners retained Jacksonville Engineering & Testing Company, Inc. (JET) to conduct only minimal testing, then relied on JET's report to conclude that the damage was not the result of sinkhole activity, and thus denied Block 60's claim.  See id. ¶¶15-19.  Block 60 contends that Southern-Owners denial was improper because Southern-Owners knew or should have known that sinkhole activity damaged the Property, and sinkhole activity is a covered loss under its insurance policy.  See id. ¶¶9, 39, 43-45, 47.

In the instant Motion, Southern-Owners asks the Court to exclude the opinion testimony of Block 60's proposed experts, Arthur C. Baker, P.E. (Baker) and James William Funderburk, P.G. (Funderburk).  See generally Motion.  Baker, an engineer, and Funderburk, a geologist and an engineer, opined that Southern-Owners did not sufficiently test the Property to rule out sinkhole activity as a cause of the damage, and that sinkhole activity damaged the Property.  See Westcoast Forensic Consulting Group, Inc., Final Report: Geotechnical Evaluation Issued July 25, 2013, Exhibit E to Complaint (Doc. No. 21 at 41-120; Westcoast Report); Deposition of Arthur C. Baker, P.E. (Doc. No. 35-4; Baker Dep.) at 25-27, 32-34, 49-50; Deposition of James William Funderburk, P.G. (Doc. No. 35-

3; Funderburk Dep.) at 14-16.[1]  While Southern-Owners appears to request that the Court preclude both experts from testifying as to any of their opinions, in the Motion, it addresses only the experts' opinion that the damage to the Property was a sinkhole loss from sinkhole activity.  Southern-Owners argues that neither Baker nor Funderburk can reliably opine as to the cause of the damage to the Property in 2007 because they reached their conclusions from testing conducted in 2013.  See Motion at 1-2, 9, 11-19.

## I.      Standard of Review

Rule 702 of the Federal Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:  (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Rule 702.  In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993), the Supreme Court explained that Rule 702 imposes an obligation on a trial court to act as gatekeeper, to ensure that any and all scientific testimony or evidence[2] admitted is not only relevant, but reliable.  To determine the admissibility of expert testimony, a trial court must consider if:

---

[1]      Baker prepared the Westcoast Report.  While it appears Funderburk issued a written report dated July 10, 2014, such a report is not found in the record.  Accordingly, the discussion of Funderburk's opinions herein is limited to those discussed in his deposition testimony.  See Funderburk Dep. at 7-8.

[2]      Although the expert testimony at issue in Daubert was scientific, the Supreme Court held in Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141, 147-48 (1999) that the Daubert analysis and a trial judge's role as gatekeeper "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'otherwise specialized' knowledge."

(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in <u>Daubert</u>; and (3) the testimony assists the trier of fact through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

See <u>United States v. Frazier</u>, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting <u>City of Tuscaloosa v. Harcros Chems., Inc.</u>, 158 F.3d 548 (11th Cir. 1998)).  The "burden of establishing qualification, reliability and helpfulness" lies with the party offering the expert opinion.  See <u>McClain v. Metabolife Int'l, Inc.</u> 401 F.3d 1233, 1238 (11th Cir. 2005) (quoting <u>Frazier</u>, 387 F.3d at 1260).  "Determining whether a witness is qualified to testify as an expert 'requires the trial court to examine the credentials of the proposed expert in light of the subject matter of the proposed testimony.'"  <u>Feliciano v. City of Miami Beach</u>, 844 F. Supp. 2d 1258, 1262 (S.D. Fla. 2012) (internal quotation omitted).

For the purpose of conducting the reliability inquiry mandated by <u>Daubert</u>, the Supreme Court has suggested that a trial court consider a number of factors, which include: (1) whether the theory or technique can be, and has been, tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the theory has attained general acceptance in the relevant scientific community.  See <u>Daubert</u>, 509 U.S. at 593-94.  These factors are not exhaustive, and the Eleventh Circuit Court of Appeals has also considered whether an expert has relied on anecdotal evidence, such as case reports; temporal proximity; and improper extrapolation.  See <u>Allison v. McGhan Med. Corp.</u>, 184 F.3d 1300, 1312 (11th Cir. 1999).  The Court's inquiry under Rule 702 must focus on the methodology, not the

conclusions, but the Court is not required to admit opinion testimony only connected to existing data by an expert's unsupported assertion.  See Daubert, 509 U.S. at 595; Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

In addition to determining the reliability of the proposed testimony, Daubert instructs that Rule 702 requires the Court to determine whether the evidence or testimony assists the trier of fact in understanding the evidence or determining a fact in issue.  See Daubert 509 U.S. at 591.  This consideration focuses on the relevance of the proffered expert testimony or evidence.  The Court explained that to satisfy this relevance requirement, the expert testimony must be "relevant to the task at hand."   Daubert, 509 U.S. at 591. Because scientific testimony does not assist the trier of fact unless it has a justified scientific relation to the facts, the Eleventh Circuit has opined that "there is no fit where a large analytical leap must be made between the facts and the opinion."  McDowell v. Brown, 392 F.3d 1283, 1299 (11th Cir. 2004).  An expert must know "facts which enable him to express a reasonably accurate conclusion instead of mere conjecture or speculation," see Jones v. Otis Elevator Co., 861 F.2d 655, 662 (11th Cir. 1988), and an expert's assurances that he has used generally accepted scientific methodology are insufficient, see McClain, 401 F.3d at 1244.  Further, to assist the trier of fact, expert testimony must concern "matters that are beyond the understanding of the average lay person . . . expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments."  Frazier, 387 F.3d at 1262-63 (internal citations omitted).

## II.    Analysis

As an initial matter, Southern-Owners does not appear to dispute that Baker and Funderburk are qualified to express opinions regarding the cause of the damage to the Property, specifically, whether there was sinkhole loss. <u>See generally</u> Motion.  Perhaps as a result, neither party provides the Court with the curriculum vitae of either expert. However, upon review of their deposition testimony, the Court is satisfied that both Baker and Funderburk are qualified to offer the proffered opinions in this action.  Baker has a bachelor of science degree in civil engineering and conducts subsidence investigations as his primary business.  Baker Dep. at 37, 49-50.  In addition to a bachelor of science degree in geology, Funderburk has two masters degrees, one in geology and one in civil engineering, with an emphasis in geotechnical engineering.   Funderburk Dep. at 5. Further, he sits on the Board of Geology for the State of Florida, and has performed 3,500 investigations like the one in the Westcoast Report. <u>See</u> Deposition of Michael Alfieri, P.G., P.Hg., CGWP (Doc. No. 35-5; Alfieri Dep.) at 42; Funderburk Dep. at 39.  Based on this information, the Court concludes that Baker and Funderburk are qualified to render opinions with regard to the presence or absence of sinkhole activity leading to a sinkhole loss at the Property.

The focus of Southern-Owners' challenge to the testimony of Baker and Funderburk is the question of the reliability of their proffered opinions.  Southern-Owners argues that there is no reliable  methodology for determining that sinkhole activity caused sinkhole loss six years after the alleged occurrence yet Block 60's experts purport to have done so.  In the Westcoast Report, Baker stated: "[I]t is our opinion that sinkhole activity was evidenced

in the results of all three borings and was a contributing cause of damage to the structure within a reasonable professional probability." Westcoast Report at 17. He clarifies the basis for his opinion in his deposition testimony. Through his experience conducting these types of investigations, he is familiar with the type of natural settlement that one would expect to see in a building that is roughly seventy years old, such as the one on the Property. <u>See</u> Baker Dep. at 18-21, 36. Baker explained that only a portion of the Property, namely the west side, demonstrated the type of extreme damage consistent with sinkhole activity:

> If it had just been natural, normal settlement, we would have seen what we see more like on the other buildings of that vintage, which is very close in, in appearance and frequency of what's on the east side of that building, which is half an inch of the floor and some hairline cracks, half an inch of the floor movement and hairline cracks.

<u>Id.</u> at 36. However, Baker did not rely simply on the appearance of the building opining as to the presence of sinkhole activity and loss:

> You can't make that assessment until you've got all the testing back: The, the results of the combination of the damage to the building, the floor survey data.
> The GPR[3] only gives you a good idea of what anomalies may or may not be in the ground, an area of difference. And then the SPT[4] borings themselves are the ones that give you the data of the ground profile to conclude that there is or is not sinkhole activity present to affect the structure.

<u>Id.</u> at 41. As for the time frame, Baker testified that sinkhole activity already occurred,

---

3    Ground Penetrating Radar (GPR) is used "to identify possible changes in the soil profile that are suggestive of anomalies in the subsurface strata." Westcoast Report at 10.

4    Standard Penetration Test (SPT) borings are used to identify sinkhole activity because they reveal whether "there is evidence of raveling or movement of soils into voids, created by water and dissolution of the carbonate material." Alfieri Dep. at 23.

affecting the structure over a period of years based on the documented cracks in the building as of 2007.  See id. at 16, 42-43.

Funderburk, who is both a geologist and an engineer,[5] laid out the basis for his opinion that sinkhole activity is present and a concurrent cause of the damage to the Property in more detail:

> But for a problematic ground condition, we probably wouldn't have the conditions we see along the west side of this building.  We understand that clay underlies this building and arguably at all positions underneath this building; however, the damages - - and there are two sets of damages here, those damages which are expected for a 70-year-old building under normal settlement and normal ongoing aging and wear-and-tear; and then those damages which are gross.
> And I would say they are - - only looking at the photographs and discussions by others, and I have not made an inspection of the building myself - - are limited to the west wall and then the west floor slab, which appears to be severely depressed, on the order of 2.5 inches.
> The fact that the clay does not correlate one-for-one with the damages is evidence of a problematic ground condition on at the location of the depressed floor on the west side, per se.
> And so running down that logic tree, that we know there are damages widespread around this building and we can account for them; and I agree, there are shrink-swell clays present, there is normal settlement to a foundation that would produce some differential settlement.  There's differential loading in this building; that is, all areas of the footing don't have the same bearing pressure.

---

[5]  In Alfieri's deposition, he explained the differences between the roles of a geologist and an engineer in assessing sinkhole activity and loss:

The geologist's role, as you already know, is below grade.  We're looking at the components of the stratigraphy, the depositional environment, we're looking to see if there's any precursory evidence for sinkhole formation that meets the statutory definition for sinkhole activity.  On the engineer's end of things, you have your geotech and your structurals.  The structurals are focused on the - - essentially, the foundation upwards and any distress to the structure.  Geotechnical engineers will look at that.  There's a bit of overlap between them at the foundation level, and they'll take the date of that.  The geologists collect, and our interpretation and design is based on that.  Engineering is based on design and data.

Alfieri Dep. at 12.

> And then lastly, there are environmental concerns, whether it's long-term fatigue in the materials, warping of wood members or timber members, et cetera.
> But when you look at this data set and you look at this west side of the building, it is anomalous to the remainder of the property.

Funderburk Dep. at 39-41.  Funderburk also opined that the conditions on the west side of the building on the Property existed prior to 2007, although the effects of those conditions may not have appeared until later.  See id. at 51 ("[I]t's my professional geologic opinion that those conditions do not occur over six years, it takes longer.").  Accordingly, Funderburk reached the same conclusion as Baker, relying on the same application of knowledge and experience, and looking at the same data from the Westcoast Report.

In the Motion, Southern-Owners suggests that subsequent weather conditions likely caused the sinkhole activity Baker and Funderburk have identified.  See Motion at 5.  However, at their depositions, Southern-Owners counsel asked both experts whether Tropical Storm Debby and the associated flooding that occurred in 2012 could have affected or caused sinkhole activity in 2013, when Westcoast conducted their testing.  Baker said the storm was not likely to have affected the subsurface conditions but might have exacerbated them.  Baker Dep. at 31-33.  ("You've got, you've got too much data, documented photographs from the Jacksonville Engineering & Testing Company, 2007 and 2011, which certainly predate the storm, that shows very similar damage conditions to what I saw.").  Similarly, Funderburk explained that the earlier report by JET documented the damage to the west wall, but acknowledged that the increase in groundwater could have caused further sinkhole activity.  Funderburk Dep. at 51-52.

Based on the experts' testimony described above, their opinions regarding the presence of sinkhole activity that caused sinkhole loss are sufficiently reliable to satisfy the requirements of Daubert and Rule 702.  Southern-Owners does not dispute the use of GPR and SPT boring data as generally accepted in the fields of geology and engineering in subsidence investigations.  See Alfieri Dep. at 22-25.  In his deposition testimony, Alfieri explains that, while there could have been sinkhole activity in 2007, he cannot say so with certainty because the data Westcoast collected cannot be backdated to determine what conditions existed in 2007.  See id. at 50-52, 65.  Indeed, Alfieri explains that industry standards in the geology field do not allow the adjustment of data for the passage of time; geologists can only analyze the data they have at the moment to determine penetration resistances and thus whether sinkhole activity is present.  See id. at 56-58.  It is for this reason that it is preferable to test for sinkhole activity as soon as possible after a claim of sinkhole loss is filed.  See id. at 60.  Neither Baker nor Funderburk's deposition testimony contradicts this statement.  However, both Baker and Funderburk conclude that sinkhole activity occurred to cause a sinkhole loss based on the 2013 data along with the evidence regarding the condition of the building including the extreme cracks in the western wall, and the much larger depression in the floor elevation on the west side of the building compared to the east side.

Southern-Owners is free to cross-examine Baker and Funderburk, much like it did at their depositions, about the effects of a drought, tropical storm, and the passage of time between the alleged sinkhole activity and Westcoast's collection of data upon which both Baker and Funderburk rest their conclusions.  However, such questions do not render their

scientific opinions unreliable.  See Daubert, 509 U.S. at 590 ("[I]t would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no certainties in science.").   The Court concludes that Southern-Owners' questions regarding the experts' methodology are better resolved through the adversary system.  See id. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").  While Baker and Funderburk may not be able to conclude with absolute certainty that sinkhole activity was present in 2007, they have done so to a reasonable degree of certainty based on Block 60's reports of damage, the recorded observations of damage to the property, the data Westcoast collected, their educational training and their practical experience as engineers conducting subsidence investigations.  This basis is sufficient to satisfy the threshold reliability requirement.

Additionally, Southern-Owners argues that other causes contributed to the alleged structural damage to the Property, such as natural settlement or clay shrinkage and swelling, between which Baker and Funderburk cannot differentiate proportionately. See Motion at 6 (citing Funderburk Dep. at 45).  Southern-Owners argues that, because of this limitation, the experts' testimony will not assist the jury.  See id. at 11.  However, Baker and Funderburk have opined that sinkhole activity was a concurrent cause of the structural damage to the Property.  They reached this conclusion by relying on specialized knowledge—reading SPT boring tests and analyzing structural damage—which is beyond the understanding of the average juror.  See Frazier, 387 F.3d at 1262.  While it would certainly be more helpful to the jury if Block 60's experts could opine as to the percentage

of loss attributable to sinkhole activity, the fact that they cannot does not render their opinions irrelevant or unhelpful.  Their expert testimony will assist the jury in deciding the main issue in the case—whether, to any extent, the damage to the Property was the result of sinkhole activity.  This renders the experts' testimony relevant, and because it is also reliable as discussed above, it is admissible at trial, and the Motion is due to be denied.

In light of the foregoing, it is

**ORDERED**:

Defendant Southern-Owners Insurance Company's Motion to Strike Plaintiff's Expert Witness [sic] Arthur C. Baker and James William Funderburk Pursuant to the Federal Rules of Evidence and Incorporated Memorandum of Law (Doc. No. 34) is **DENIED**.

**DONE AND ORDERED** in Jacksonville, Florida, this 16th day of January, 2015.

MARCIA MORALES HOWARD
United States District Judge

lc16

Copies to:

Counsel of Record

-12-